IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TARA TAYLOR, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civ. No. JKB-25-1381 |
| SUNRUN INC., *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiffs Tara Taylor and Claven Brooks sued Defendants Sunrun Inc., Freedom Forever Maryland, LLC, and Boundless Energy, Inc. on claims related to a transaction to install solar panels on Plaintiffs' home. (*See generally* ECF No. 3.)

Before the Court are three motions: a Motion to Compel Arbitration and Stay Action, filed by Sunrun, (*see* ECF No. 5); a Motion to Compel Arbitration and Stay Proceedings, or, in the Alternative, to Partially Dismiss for Failure to State a Claim, filed by Freedom Forever, (*see* ECF No. 8); and a Motion to Compel Arbitration and Stay Proceedings, filed by Boundless, (*see* ECF No. 23). The motions are fully briefed, and no hearing is required.[1] *See* Local Rule 105.6 (D. Md. 2025).

The motions will be granted in part and denied in part. They will be granted insofar as they seek to compel arbitration. They will be denied otherwise. Plaintiffs' claims will be dismissed without prejudice.

---

[1] Boundless's request for a hearing, (ECF No. 28), will be denied.

## I.    BACKGROUND[2]

### A.    Factual Background

Taylor and Brooks are residents of Baltimore. (ECF No. 3 ¶ 1–2.)  Sunrun and Freedom Forever are Delaware corporations headquartered in California and registered to do business in Maryland. (*Id.* ¶¶ 3–4.)  Boundless is a Massachusetts corporation headquartered in Massachusetts and registered to do business in Maryland. (*Id.* ¶ 5.)

Sunrun owns and maintains solar-panel systems for residential use. (*See* ECF No. 3 ¶¶ 31–32, 36, 47–48, 53–56.)  Consumers who have Sunrun panels installed on their homes pay Sunrun on a rolling basis for the electricity the panels generate. (*Id.* ¶¶ 48–49.)  These contracts are designed to last years, even decades. (*See id.* ¶¶ 49, 52, 54.)

In its capacity as panel owner and supplier, Sunrun "oversees a network of partnerships" with solar-installation contractors. (ECF No. 3 ¶ 31; *see generally id.* ¶¶ 32–36.)  Through this partnership program, Sunrun contracts with installation firms and "deputizes" their salespeople to solicit consumers' business. (*See id.* ¶¶ 31–33.)

Freedom Forever is an installation firm that participates in Sunrun's partnership program. (*See* ECF No. 3 ¶ 37.)  In that capacity, Sunrun exercised a considerable degree of oversight of Freedom Forever's consumer interactions, including the software its salespeople used, the products and contracts they could offer, and their marketing and sales strategies. (*See id.* ¶ 45.)

Freedom Forever is a fifty-percent owner of Boundless. (ECF No. 3 ¶ 39.)  Boundless "actively solicits sales of solar products" for both Freedom Forever and Sunrun. (*Id.* ¶ 38; *see also*

---

[2] For purposes of addressing Defendants' motions to compel arbitration, the factual assertions of the complaint (including any attached or incorporated documents) are assumed true. *See Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 233–34 (4th Cir. 2019) (accepting as true those assertions related to the "underlying dispute between the parties").  The relevant assertions are reproduced below.  Any assertions not critical to this decision are included solely for additional context.

*id.* ¶ 45 (asserting that both Freedom Forever and Boundless "acted as agents and at the direction of Sunrun as part of" the partnership program).)

In November 2023, a salesperson "purporting to be associated with" Freedom Forever approached Taylor about installing a solar-panel system on her and Brooks's roof. (ECF No. 3 ¶ 9.) The salesperson "was actually an agent or employee" of Boundless, not Freedom Forever. (*Id.* ¶ 10.) Neither he nor Boundless was licensed by the Maryland Home Improvement Commission. (*Id.* ¶¶ 10, 40. *But see id.* ¶¶ 41–42 (asserting that the salesperson is in the commission's database and that he purports to have a license number).)

After talking to Taylor about what she would have to pay for the system, the salesperson produced a document on his phone and asked Taylor to sign and initial in several locations. (*See* ECF No. 3 ¶¶ 11, 13.) He "did not explain to her what she was signing, and did not explain to her that she had a right to cancel the agreement" after it was signed. (*See id.* ¶ 13.) He also told her "he was having troubles with his phone" and "encouraged her to sign the document quickly." (*Id.*) Taylor signed and initialed in several places. (*See, e.g.*, ECF No. 1-5 at 14, 23, 27, 32, 35, 38–40.) She did not receive a copy of the paperwork "at th[at] time." (ECF No. 3 ¶ 13.)

That document contains an arbitration provision. (*See* ECF No. 3 ¶ 63; ECF No. 1-5 at 20–23.) It provides that, "[u]nless legally prohibited," the contracting parties "agree to settle any [d]ispute related to this contract in good faith via mediation." (ECF No. 1-5 at 20–21.) If the parties do not resolve their dispute within sixty days of mediation, each "may elect to require to resolve [the] [d]ispute via binding arbitration." (*Id.* at 21.) This option applies to **"All Disputes**," *i.e.*, "all disputes that would usually be decided in court and are between [the parties], including without limitation all claims related to or arising out of" the contract, the system, or the parties' relationship. (ECF No. 1-5 at 21.) That "include[s] claims related to amendments, Disclosures,

3

Change Orders, collections, privacy and Customer Information, claims related to the validity of this Agreement, AND THE ARBITRABILITY OF ANY DISPUTE(S)." (*Id.* (capitalization in original).) "In short," it concludes, "Disputes has the broadest reasonable meaning." (*Id.*) At the end of the arbitration provision, Taylor initialed a statement saying she "agree[d] to arbitration and waive[d] [her] right to a jury trial." (ECF No. 1-5 at 23.)

In December 2023, representatives from Freedom Forever inspected Taylor and Brooks' roof. (*See* ECF No. 3 ¶¶ 14–15.) Sunrun soon informed Taylor it would increase the size of the solar-panel system, resulting in a higher monthly payment. (*Id.* ¶ 16.)

Freedom Forever installed the system in January 2024. (ECF No. 3 ¶ 19.) But it "failed to adequately seal or repair the roof penetrations or interior damage," leaving Taylor and Brooks' home "vulnerable to water intrusion." (*Id.* ¶ 20.) Over the following months, this led to "significant" and "severe" leaks, which Taylor "promptly" and "repeatedly" reported to both Sunrun and Freedom Forever. (*See id.* ¶¶ 21–25.) Neither company "took meaningful action to remediate" the issues. (*See id.* ¶¶ 21, 25.) In the end, Taylor and Brooks' roof sustained "extensive damage" due to Sunrun and Freedom Forever's "improper installation." (*Id.* ¶ 28.)

### B.    Procedural History

On March 22, 2025, Taylor and Brooks sued Sunrun, Freedom Forever, and Boundless in the Circuit Court for Baltimore City. (ECF No. 1-3.) Their complaint invoked seven rights of action, seeking damages of more than $75,000 on each. (*See id.* ¶¶ 60–134.) At some point during the state proceedings, Plaintiffs amended their complaint. (*See* ECF No. 1-2 at 3; ECF Nos. 1-12, 3.) On April 30, Sunrun timely removed. (*See* ECF No. 1 ¶¶ 4, 14.)

Taylor brings claims of fraud (or, in the alternative, fraudulent concealment) (Count I), (ECF No. 3 ¶¶ 60–72); negligence (Count II), (*id.* ¶¶ 73–78); nuisance (Count III), (*id.* ¶¶ 79–87);

violations of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 to
-501 (Count IV), (*id.* ¶¶ 88–109); violations of the Maryland Door-to-Door Sales Act, Md Code
Ann., Com. Law §§ 14-301 to -306, (Count V), (*id.* ¶¶ 110–19); breach of contract (Count VI),
(*id.* ¶¶ 120–25); and breach of lease (Count VII), (*id.* ¶¶ 126–34). Counts I through V are brought
against all three defendants; Counts VI and VII are brought against Sunrun only.

Brooks joins Taylor on only the negligence claim (Count II), (ECF No. 3 ¶¶ 73–78); the
nuisance claim (Count III), (*id.* ¶¶ 79–87); and the Maryland Consumer Protection Act claim
(Count VI), (*id.* ¶¶ 88–109).

On May 7, 2025, Sunrun moved to compel arbitration and stay this action. (*See* ECF No.
5.) On May 14, Freedom Forever did the same, alternatively moving to dismiss Counts I, IV, and
V (the fraud and statutory counts) for failure to state a claim. (*See* ECF No. 8.) Boundless soon
followed, moving on July 11 to compel arbitration or, in the alternative, to dismiss Counts I, II,
and III in their entirety and to dismiss Count IV as to Brooks. (*See* ECF No. 23.) Plaintiffs oppose
dismissal and all efforts to arbitrate their claims. (*See* ECF Nos. 12, 13, 26.)

## II.    LEGAL STANDARD

The Federal Arbitration Act empowers federal courts to remedy a party's noncompliance
with an arbitration clause. *See* 9 U.S.C. §§ 3–4. In an appropriate case, relief consists of a judicial
order compelling the parties to enter arbitration, *id.* § 4, and a stay or dismissal of any judicial
proceedings concerning otherwise arbitrable issues, *id.* § 3; *Choice Hotels Int'l, Inc. v. BSR
Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001).

Motions to compel arbitration are enforced under Federal Rule of Civil Procedure 12(b)(3),
which permits motions to dismiss for improper venue. *Amos v. Amazon Logistics, Inc.*, 74 F.4th
591, 594 n.2 (4th Cir. 2023). To obtain relief under the FAA, a movant must show "(1) the

existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect[,] or refusal of the defendant to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (citation omitted).

The parties contest only the second *Adkins* element. That element is satisfied when (1) the parties have formed a valid arbitration agreement and (2) the agreement embraces the dispute in question. *See Chorley Enters., Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015). The first set of issues—formation and validity—are for a court to decide. *Johnson v. Cont. Fin. Co., LLC*, 131 F.4th 169, 173, 175–76 (4th Cir. 2025); *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). But parties can agree to arbitrate the second. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." (citations omitted)). The bottom line is that, if an arbitration agreement was formed and is valid, a court gives full effect to the choices it reflects. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024); 9 U.S.C. § 2.

Issues of formation and validity are analyzed under the summary-judgment standard. Any party seeking to compel arbitration must produce evidence of a valid arbitration agreement that, if left uncontroverted, entitles that party to arbitration as a matter of law. *See Austin v. Experian Info. Sols., Inc.*, --- F.4th ---, 2025 WL 2177331, at *5 (4th Cir. 2025). In support of its motion, the party may introduce evidence "outside the pleadings—including, as relevant here, the contract containing the applicable arbitration clause." *Amos*, 74 F.4th at 594 n.2 (citation omitted). If the

6

opponent shows no genuine issue of material fact as to formation and validity, the agreement will be honored according to its terms. *See Austin*, --- F.4th ---, 2025 WL 2177331, at \*5.

Ambiguities in the terms of an arbitration clause are "resolved in favor of arbitration." *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). This reflects the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). A district court's role is even more limited if an agreement chooses arbitration to resolve questions of arbitrability. *See Henry Schein*, 586 U.S. at 69; *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 & n.9 (4th Cir. 2019) (describing a court's role in that context as first deciding whether the parties "made an agreement to arbitrate *any* issue," then referring the rest to an arbitrator) (emphasis in original)). Because that choice vests an arbitrator with the authority to decide what is arbitrable, any agreement to that effect must be "clear[] and unmistakabl[e]." *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995).

## III.    ANALYSIS

Taylor and Sunrun formed a valid agreement to arbitrate. Because that agreement refers issues of arbitrability to an arbitrator, there is nothing more for the Court to decide at this time. Plaintiffs' claims will be dismissed without prejudice.

### A.    Taylor and Sunrun Formed a Valid Arbitration Agreement.[3]

The allegations and supporting evidence show, and Plaintiffs do not dispute, that Taylor and Sunrun formed an arbitration agreement. On all grounds this Court can consider (as opposed to those an arbitrator must address), that agreement is valid. It will be enforced.

---

[3] Because the parties seeking arbitration each point to a document that purports to be a binding arbitration agreement, they have met their obligations under the summary-judgment standard. *See Austin*, --- F.4th ---, 2025 WL 2177331, at \*5. The following focuses on whether Plaintiffs successfully counter that showing.

1.    Taylor and Sunrun Formed an Arbitration Agreement.

"Whether an arbitration agreement was properly formed is 'a question of ordinary state contract law principles.'" *Johnson*, 131 F.4th at 178 (citation omitted).  In answering this question, a district court applies the law of the state in which it sits. *See id.* at 178 (citing *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Under Maryland law, as elsewhere, a contract is formed whenever the parties satisfy the basic requirements of a contract: offer, acceptance, and consideration. *Ford v. Genesis Fin. Sols., Inc.*, 726 F. Supp. 3d 441, 449 (D. Md. 2024) (citing *Peer v. First Fed. Sav. & Loan Ass'n of Cumberland*, 331 A.2d 299, 301 (Md. 1975)).  A claim that a contract was never formed must successfully negate one or more of those elements. *See Johnson*, 131 F.4th at 176 (citing Restatement (Second) of Contracts § 17(1) (Am. L. Inst. 1981)).

Plaintiffs offer several reasons why they believe the contract is "void and unenforceable." (*See, e.g.*, ECF No. 12-1 at 3.)  They argue it fails to comply with the federal Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), 15 U.S.C. §§ 7001–31, and this state's analogue, the Maryland Uniform Electronic Transactions Act ("MUETA"), Md. Code Ann., Com. Law §§ 21-101 to -120.  They insist it was entered into in violation of Maryland's home-improvement licensing laws, Md. Code Ann., Bus. Reg. § 8-601.  They maintain it is procedurally and substantively unconscionable as well as fraudulently induced.  And they say its enforcement would otherwise violate Maryland public policy. (*See* ECF No. 12-1 at 3, 8; ECF No. 13-1 at 3–4; ECF No. 26-1 at 1–6.)

But these arguments go to validity, not formation.  Again, formation asks only whether there was mutual assent (*i.e.*, offer and acceptance) and consideration. *Johnson*, 131 F.4th at 176.  Validity, by contrast, concerns itself with the many reasons an *extant* contract may be void,

voidable, or unenforceable. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 447–49 (2006). Nowhere do Plaintiffs contend Taylor failed to form an agreement. And because the doctrines of voidness, voidability, and unenforceability cannot apply to nonexistent contracts,[4] none of the challenges Plaintiffs mount calls into question the parties' mutual assent to or consideration for the overall transaction, much less the arbitration provision. *See* Restatement (Second) of Contracts § 178 (describing as "unenforceable" certain contracts that legislation declares unenforceable or that violate public policy); *id.* § 181 (same, but upon a party's "failure to comply with a licensing, registration or similar requirement"); *Johnson*, 131 F.4th at 178 n.2 ("A party cannot transform a run-of-the-mill unconscionability claim into a contract-formation challenge simply by calling it one.").

True enough, allegations of misrepresentation can go to either formation or validity, depending on the circumstances. *Compare* Restatement (Second) of Contracts § 163 (formation), *with id.* § 164 (validity). And Plaintiffs do contend Taylor entered the contract under false pretenses. (*See, e.g.*, ECF No. 1-12 ¶¶ 60–72.)

But for fraudulent conduct to defeat formation, it must lure into a contractual relationship "one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract." Restatement (Second) of Contracts § 163. In other words, the conduct must leave a claimant in the dark as to whether "the other party may infer from h[er] conduct that [s]he assents to [a] contract" at all; it is not enough for her to misunderstand some of the contract's terms, nor even to be "deceived as to the identity of the other party." *Id.* § 163, cmt. a; *see*

---

[4] Some authorities have equated agreements that are void *ab initio* to agreements that were never formed. *See, e.g., Julian v. Buonassissi*, 997 A.2d 104, 119 (Md. 2010) ("A void contract 'is not a contract at all.'" (quoting Restatement (Second) of Contracts § 7, cmt. a)). Whether this is a semantic equivalence or a purely rhetorical one, the Supreme Court has held that, for purposes of the FAA, voidness is a question of validity, not formation. *See Buckeye*, 546 U.S. at 448–49 & n.3. Plaintiffs' description of the contract as "void" does not change the formation analysis.

*generally Pease v. Wachovia SBA Lending, Inc.*, 6 A.3d 867, 880–82 (Md. 2010) (Adkins, J., concurring in part and dissenting in part) (distinguishing between fraud in the inducement, which permits a defrauded party to void the contract, and fraud in the factum, which defeats formation).

Plaintiffs' fraud allegations do not meet that standard. That Taylor signed the agreement and initialed the arbitration clause is all but fatal to this line of attack. *See* Restatement (Second) of Contracts § 163, cmt. b ("If the recipient had a reasonable opportunity to know the character or essential terms of the proposed contract, . . . [her] conduct is effective as a manifestation of assent."). And even if it were not, Plaintiffs' argument is undercut by the presence of other allegations that refer to—and depend upon—the existence of a contract. (*See, e.g.*, ECF No. 1-12 at 3 (arguing that defendants "encumber[ed] Plaintiffs with an expensive contract containing undisclosed fees for a twenty-five year period"); *id.* ¶ 13 (alleging that the salesperson "did not explain to [Taylor] that she had a right to cancel the agreement"); *id.* ¶ 26 (alleging that Sunrun and Freedom Forever "failed to uphold their contractual . . . obligations"); *id.* ¶ 72 (seeking to "rescind" the contract).)

At bottom, Plaintiffs do not challenge the existence of Taylor's contract with Sunrun, and instead question only "whether the parties may be held to the terms of the[] agreement." *Ford*, 726 F. Supp. 3d at 449 (citation omitted). Because the pleadings supply no reason to doubt the fact of formation, the Court is satisfied the parties entered into an agreement to arbitrate.

2.    The Arbitration Agreement is Valid on its Own Terms.

Under the FAA, courts may address only those validity challenges that go to the validity of the arbitration provision itself, not the validity of another contract provision, nor that of the overall agreement. Here, the only validity challenge that meets this requirement is the claim the provision is unconscionable. But it is not unconscionable. So, it will be enforced.

      *i.       The Only Validity Challenge the Court Can Consider is the Claim of Unconscionability.*

"[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Rent-A-Center*, 561 U.S. at 70–71 (citation omitted). This means "a party seeking to avoid arbitration must directly challenge [the validity of] the arbitration or delegation clause, not just the contract as a whole." *Coinbase*, 602 U.S. at 150–51. Validity challenges "to another provision of the contract, or to the contract as a whole," are for the arbitrator to decide. *See Rent-A-Center*, 561 U.S. at 70–72; *Coinbase*, 602 U.S. at 150 (citation omitted); *see also Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 547 (Md. 1994) (rejecting the argument that "by enforcing [an] arbitration agreement, [the court] implicitly recognize[s] the validity of the entire contract in question").

Virtually none of Plaintiffs' attacks is addressable by this Court. Most concern the validity of the entire contract, not the arbitration clause specifically. (*See, e.g.*, ECF No. 12-1 at 3–7 (opposing arbitration "because the contract at issue, including its arbitration clause, is void and unenforceable" under the E-Sign Act, the MUETA, and Maryland's licensure provisions); ECF No. 13-1 at 3–4 (similar); ECF No. 26-1 at 1–6 (similar).) But again, to justify judicial intervention, the party opposing arbitration must "directly challenge" the arbitration provision. *Coinbase*, 602 U.S. at 150–51. And while a court must consider challenges that apply "equally" to an arbitration provision and a whole contract, it need do so only when the alleged defect originates in the arbitration provision and infects the rest of the agreement, not the other way around. *See id.*; *Rent-A-Center*, 561 U.S. at 71. Otherwise, if an issue originates elsewhere in the agreement (or with the agreement as a whole) and only secondarily affects the arbitration clause, it is a merits question reserved for arbitration. *See Coinbase*, 602 U.S. at 150–51; *Rent-A-Center*, 561 U.S. at 71.

11

One attack remains.  Plaintiffs contend the arbitration provision is procedurally and substantively unconscionable. (*See* ECF No. 12-1 at 7–13; ECF No. 13-1 at 3–4.)  Although aspects of this challenge rest on allegations about defects in the overall contract—for example, the rushed nature of the signing and the contract being one of adhesion, (*see* ECF No. 12-1 at 8–10)—others flow from the arbitration clause itself, and thus are within the band of issues the Court must address. *See Coinbase*, 602 U.S. at 150–51; *cf. Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 729 (4th Cir. 2025) (deciding claims about the unconscionability of the arbitration clause while leaving to the arbitrator those about the rest of the contract).

ii.    *The Arbitration Agreement Is Not Unconscionable.*

As with formation, questions of validity are governed by the law of the forum state. *See Meadows*, 132 F.4th at 726.

Under Maryland law, a court may invalidate a contract as unconscionable only if the contract is profoundly unfair. *See Doyle v. Fin. Am., LLC*, 918 A.2d 1266, 1273 (Md. Ct. Spec. App. 2007).  This requires both procedural and substantive unconscionability.  *Id.* at 1274. Procedural unconscionability refers to the inflexible or deceptive way a contract was made. *See Rankin v. Brinton Woods of Frankford, LLC*, 211 A.3d 645, 655–56 (Md. Ct. Spec. App. 2019). Substantive unconscionability refers to the harshness or inequity of its terms. *See id.*  Each issue is a question of law. *See Doyle*, 918 A.2d at 1278.

The arbitration clause is neither procedurally nor substantively unconscionable.  Start with procedure.  Plaintiffs first argue the arbitration clause "appears in the same font and format as the rest of the contract and lacks any emphasis, such as bolding or underlining, that might alert the consumer to its importance." (ECF No. 12-1 at 9.)  They add that "the word 'arbitration' does not

12

appear . . . until page 19" of a "lengthy" document whose signing was "rushed." (*Id.*) They then contend Taylor's waiver of a jury trial was neither knowing nor voluntary. (*Id.*)[5]

These arguments are unconvincing. To start, Plaintiffs are wrong that the arbitration provision "lacks any emphasis" to signal its importance. The arbitration section begins with a bold, blue, all-caps header, "**ARBITRATION OF DISPUTES AND CLASS WAIVER**." (ECF No. 1-5 at 19.) It states, again in bold, all-caps text, that "**YOU ARE WAIVING THE RIGHT TO INITIATE OR PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING**." (*Id.* at 20.) And it concludes with a large blue box, offset against a white background, with a line for the offeree's initials and a final, all-caps warning:

> BY INITIALING, YOU AGREE TO ARBITRATION AND WAIVE YOUR RIGHT TO A JURY TRIAL. YOU ALSO WAIVE YOUR RIGHT TO INITIATE OR PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING, INCLUDING IN A PRIVATE ATTORNEY GENERAL CAPACITY.

(*Id.* at 22.) Taylor signed her initials in that box—one of just a few such boxes in the entire contract. (*See id.*)

Maryland courts have held that "the failure to highlight the binding nature of mediation and arbitration clauses or the significance of what the applicant is being compelled to waive" can "support[] a finding of a procedural unconscionability." *Rankin*, 211 A.3d at 624 (citing *Walther v. Sovereign Bank*, 872 A.2d 735, 755 (Md. 2005)). But this provision contains no such defect. Whether or not the signing process was rushed in a way that voids the entire agreement (which remains an issue for the arbitrator), the arbitration clause—and particularly what Taylor gave up by signing it—are quite clear. This is not a situation in which the relevant provisions "are simply

---

[5] Plaintiffs also assert the arbitration agreement was procedurally unconscionable because it was "embedded in an inflexible and opaque contract of adhesion." (ECF No. 12-1 at 9–10.) Because this putative defect emanates not from the arbitration clause but from the contract as a whole, the Court leaves it for an arbitrator. *See Rent-A-Center*, 561 U.S. at 71; *Coinbase*, 602 U.S. at 151.

numbered paragraphs that are presented in the same format as every other provision," without "any apparent emphasis . . . denoting important provisions or concepts." *Rankin*, 211 A.3d at 657. On top of that, courts are especially likely to uphold arbitration clauses "placed in a key location, such as near the signature line of an agreement." *See Walther*, 872 A.2d at 755 (emphasis and citation omitted). That this clause had its own line for initials—a line Taylor signed—indicates that, rushed or not, she had reason to know this section of the purportedly "lengthy" contract was special (by virtue of requiring her to acknowledge it specifically).

Plaintiffs' argument about jury-trial waiver fails for similar reasons. Maryland law requires waiver of one's right to a jury trial to be "knowing and intelligent." *Walther*, 872 A.2d at 753 (citation omitted). But here, as in *Walther*, Plaintiffs' "bald assertion that . . . they did not know that the arbitration clause contained such a waiver" is "fundamentally lacking in persuasive effect." *Id.* at 754. The contract displayed the offset, all-caps text "YOU AGREE TO ARBITRATION AND WAIVE YOUR RIGHT TO A JURY TRIAL," right above where Taylor initialed. (ECF No. 1-5 at 22.) And even if this obvious, unambiguous waiver were absent, the argument still fails, as "the 'loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate.'" *Walther*, 872 A.2d at 754 (emphasis omitted) (quoting *Sydnor v. Conseco Fin. Serv'g Corp.*, 252 F.3d 302, 307 (4th Cir. 2001)).

Next, substantive unconscionability. Plaintiffs first argue the arbitration clause's referral to an arbitrator of questions of arbitrability "conflicts with controlling Maryland law." (ECF No. 12-1 at 10.) They then argue the mandatory-mediation provision "imposes a procedural hurdle that may delay access to meaningful dispute resolution without allocating any clear responsibility for the costs of mediation." (*Id.* at 11.)[6]

---

[6] Plaintiffs also describe as substantively unconscionable a one-year time bar on claims made "in connection with, arising out of, or in any way related to th[e] agreement." (ECF No. 12-1 at 12 (quoting ECF No. 1-5 at 18).) But this

Neither argument avails. Plaintiffs are mistaken that assigning questions of arbitrability to an arbitrator is incompatible with Maryland law. Maryland courts regularly affirm that state law permits this practice. *See, e.g.*, *Allstate Ins. Co. v. Stinebaugh*, 824 A.2d 87, 94 (Md. 2003); *Prince George's County v. Fraternal Order of Police, Prince George's Cnty., Lodge 89*, 914 A.2d 199, 205–07 (Md. Ct. Spec. App. 2007). It happened in the very case Plaintiffs cite for the opposite proposition. *See Balt. Cnty. Fraternal Order of Police Lodge No. 4 v. Baltimore County*, 57 A.3d 425, 439–40 (Md. 2012). But even if state law said otherwise, the FAA—whose applicability to this case is undisputed—is a federal statute, the final and conclusive interpretation of which is the province of the U.S. Supreme Court. And that court has held time and again that questions of arbitrability are delegable to an arbitrator. *See, e.g.*, *Rent-A-Center*, 561 U.S. at 68–69; *Coinbase*, 602 U.S. at 148; *Henry Schein*, 586 U.S. at 65; *First Options of Chi.*, 514 U.S. at 943.

The delay-or-expense-of-mediation point fares no better. Plaintiffs speculate that the lack of a cost-allocation term means "low-income consumers like Ms. Taylor . . . may be unable to afford upfront mediation fees or navigate the administrative complexity of initiating . . . mediation." (ECF No. 12-1 at 11.) But the Supreme Court already rejected a virtually identical claim as inadequately supported (again, in the sole decision Plaintiffs cite for the opposite view):

> It may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her . . . rights in the arbitral forum. But the record does not show that [she] will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. . . . The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that [a party] will be saddled

---

provision exists outside and independent of the arbitration clause, by its terms applying to all claims, not just those brought in arbitration. (*See* ECF No. 1-5 at 18.) In other words, whether the limitation term is unconscionable or otherwise invalid does not bear on the validity of the parties' agreement to arbitrate in the first instance. The objection thus lies at the heartland of issues for an arbitrator, not the Court, to address. *See Rent-A-Center*, 561 U.S. at 72 ("Application of the severability rule does not depend on the substance of the remainder of the contract. [The FAA] operates on the specific 'written provision' to 'settle by arbitration a controversy' that the party seeks to enforce." (quoting 9 U.S.C. § 2)).

with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90–91 (2000). The contract is silent on who bears the upfront cost of mediation. (*See* ECF No. 1-5 at 19–20.) Even if it ended up being Plaintiffs, it is not at all clear the costs would be a barrier, let alone one that renders the provision unconscionable. An attenuated chain of possibilities cannot support such a holding.

In sum, the Court is unpersuaded by Plaintiffs' assertions of unconscionability emanating from the arbitration provision itself. And because the remainder of the unconscionability claims are rooted elsewhere in the agreement (or in the agreement as a whole), they are not for the Court to decide. *See Buckeye*, 546 U.S. at 449; *Coinbase*, 602 U.S. at 150–51. That "the claimed basis of invalidity for the contract as a whole will [in some cases] be much easier to establish than the same basis as applied only to the severable agreement to arbitrate" does not change this result. *See Rent-A-Center*, 561 U.S. at 71. The arbitration agreement is valid, at least on all grounds this Court, at this stage, is competent to address.

### B. All Other Issues, Including Whether the Remaining Disputes Are Arbitrable, Are for an Arbitrator to Decide.

"[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein*, 586 U.S. at 69. Issues of arbitrability include "gateway" questions such as "whether the parties have agreed to arbitrate," "whether their agreement covers a particular controversy," *id.* at 67–68, and whether it binds a particular party, like one who did not sign the contract, *see Howsam*, 537 U.S. at 84.

In general, to determine the meaning of an arbitration agreement under the FAA, courts need only "interpret the contract as written." *Henry Schein*, 586 U.S. at 68. But agreements to arbitrate questions of arbitrability must meet an additional, higher standard: the parties' intent must

16

be "clear and unmistakable." *Id.* at 69 (citation omitted). This is an "exacting" test, "and the presence of an expansive arbitration clause, without more, will not suffice." *Peabody Holding Co., LLC v. Utd. Mine Workers of Am., Int'l Union*, 665 F.3d 96, 102 (4th Cir. 2012).

By its terms, the arbitration agreement governs "all claims related to or arising out of" the contract, the solar system, or Sunrun's (or any related parties') relationship with the offeree. (ECF No. 1-5 at 20.) That includes, in relevant part, all claims related to "THE ARBITRABILITY OF ANY DISPUTE(S)." (*Id.* (capitalization in original).)

The parties' objective intent is plain: arbitrability issues go to an arbitrator. The contract says so, in all-caps font amid otherwise lowercase text. (*See* ECF No. 1-5 at 20.) Nothing more is required. *See Carson v. Giant Food, Inc.*, 175 F.3d 325, 330–31 (4th Cir. 1999) ("Those who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect."). It is hard to think of what "more" could be.

Because the parties clearly and unmistakably referred to arbitration questions like *what is arbitrable* and *who must arbitrate*, the Court has no business deciding anything further. Should Plaintiffs desire to continue pressing their claims, they must do so in arbitration, at least until an arbitrator says otherwise.

## IV.    CONCLUSION

The parties formed an agreement to arbitrate. Whether or not the agreement turns out to be invalid due to a defect in some separate provision or with the contract overall, it is valid on all grounds intrinsic to it. The agreement shows the parties' clear and unmistakable intent to refer all questions, including questions of arbitrability, to an arbitrator. The arbitrator might decide that

17

many of the claims, or even all of them, are not arbitrable.  But it is the arbitrator's call to make.

So, Plaintiffs' claims will be dismissed without prejudice.

A separate order will issue.

DATED this __/9__ day of August, 2025.

BY THE COURT:

James K. Bredar
United States District Judge

18